# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| JOY E. BLEDSOE,<br>[Residential address filed under seal.]<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>DEPARTMENT OF THE ARMY,<br>101 Army Pentagon<br>Washington, DC 20310-0101<br><br>MICHAEL T. MAHONEY, in his official<br>capacity as Deputy Assistant Secretary of<br>the Army (Review Boards),<br>111 Army Pentagon<br>Washington, DC 20310-0111<br><br>AGNES G. SCHAEFER, in her official<br>capacity as Assistant Secretary of the Army<br>(Manpower and Reserve Affairs),<br>111 Army Pentagon<br>Washington, DC 20310-0111<br><br>BRETT G. SYLVIA, in his official capacity<br>as Commanding General of the 101st<br>Airborne Division,<br>2700 Indiana Avenue<br>Fort Campbell, KY 42223<br><br>CHRISTINE E. WORMUTH, in her official<br>capacity as Secretary of the Army,<br>101 Army Pentagon<br>Washington, DC 20310-0101<br><br>　　　　Defendants. | Case No.: 1:24-cv-3509 |

## INTRODUCTION

1.      Captain Joy E. Bledsoe is an officer in the United States Army. Her sincerely held religious beliefs preclude her from serving in a combatant role. As a conscientious objector, she asserts her legal right to noncombatant status while remaining in the Army.

2.      Captain Bledsoe received her Army commission following her graduation from the United States Military Academy at West Point in 2018. She received the highest performance score among all graduating cadets and was named valedictorian of her class. She subsequently became a Military Intelligence Officer.

3.      Captain Bledsoe is a Christian. In the years following her graduation, she wrestled with the relationship between her religious faith and her role in the Army. Captain Bledsoe's religious beliefs developed through intensive study, prayer, and introspection. Her faith has progressed, and during her time in the Army she has become committed to principles of Christian nonviolence that are incompatible with service as a military combatant.

4.      Although Captain Bledsoe's beliefs prevent her from contributing to the destruction of human life as a combatant, she remains deeply committed to serving her country through active-duty service in the United States Army. The Army has a designation intended for people in Captain Bledsoe's position—that is, soldiers who want to continue their service in the Army while following their religious conscience. Called Class 1-A-O status, this designation is reserved for a "[c]onscientious objector available for noncombatant military service only." *See* 32 C.F.R. § 1630.11; *see also* Army Regulation (A.R.) 600-43 Glossary of Terms (defining a 1-A-O conscientious objector as a person who "sincerely opposes participation only in combatant military training and service"). Captain Bledsoe accordingly requested classification

as a 1-A-O conscientious objector, a designation that would permit her to remain in the Army and serve her country without violating her religious beliefs.

5.    The Army has a rigorous process for evaluating whether soldiers satisfy the criteria for Class 1-A-O status. Throughout the process, every person who has reviewed Captain Bledsoe's request has recognized that her religious beliefs are sincere. Both her immediate commander and the investigating officer reviewing her petition recommended granting noncombatant status to Captain Bledsoe. The Department of the Army Conscientious Objector Review Board ("DACORB") agreed in a thoroughly reasoned decision.

6.    Against DACORB's recommendation, Defendants denied Captain Bledsoe's petition. Their authorized final decisionmaker was the Deputy Assistant Secretary of the Army (Review Boards), Defendant Michael T. Mahoney. Defendant Mahoney provided no substantive explanation for the denial.

7.    Defendants' decision to reject Captain Bledsoe's request for conscientious objector status was unlawful. Defendants' action violated the Religious Freedom Restoration Act (RFRA) by imposing a substantial burden on Captain Bledsoe's exercise of religion without furthering a compelling interest. *See* 42 U.S.C. 2000bb-1.

8.    Defendants' unreasoned, perfunctory denial of Captain Bledsoe's request also misapplied the standards set forth in the Army's own regulations and failed to provide the reasoning required by the Administrative Procedure Act (APA). *See* 5 U.S.C. § 706.

9.    Captain Bledsoe asks the Court to protect her rights under federal law by vacating Defendants' decision denying her application for 1-A-O status, ordering Defendants to grant her that status, and enjoining Defendants from assigning her to duties incompatible with that status.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over Captain Bledsoe's claims under 28 U.S.C. § 1331 and 5 U.S.C. § 702.

11.     This Court has the authority to grant declaratory and injunctive relief under RFRA, 42 U.S.C. § 2000bb-1(c).

12.     This Court also has the power under the APA to set aside unlawful agency actions and compel agency actions unlawfully withheld, 5 U.S.C. § 706.

13.     Venue is proper in this district under 28 U.S.C. § 1391(e) because Defendants are agencies, officers, and employees of the United States sued in their official capacities; Defendants perform their official duties in this district; and a substantial part of the events giving rise to Captain Bledsoe's claims occurred in this district.

## PARTIES

14.     Plaintiff Joy E. Bledsoe is a Captain in the United States Army. She attended the United States Military Academy at West Point, from which she graduated as valedictorian in 2018. Following her West Point graduation, her religious views about the sanctity of life and the morality of engaging in violence began to shift. In the course of her military service, she eventually determined that her religious beliefs prohibited her from contributing to the destruction of human life. She therefore requested classification as a conscientious objector. She sought 1-A-O noncombatant status so that she could continue serving her country in a manner consistent with her beliefs.

15.     Defendant Department of the Army ("Army") is an executive agency of the federal government and is responsible for the administration and operation of the United States Army. Although a number of Army officials initially recommended that Captain Bledsoe's

request for conscientious objector status be granted, the Army ultimately rejected her request through the Army's authorized decisionmaker, Defendant Mahoney.

16.     Defendant Michael T. Mahoney is sued only in his official capacity as Deputy Assistant Secretary of the Army (Review Boards). Under Army regulations, Defendant Mahoney is responsible for making "the final determination" on applications by conscientious objectors seeking noncombatant status. *See* A.R. 600-43 ¶ 2-5(a); *see also id.* ¶ 1-4(a)(2).

17.     Defendant Agnes G. Schaefer is sued only in her official capacity as Assistant Secretary of the Army (Manpower and Reserve Affairs). Under Army regulations, Defendant Schaefer is charged with overseeing the disposition of conscientious objector claims. *See id.* ¶ 1-4(a).

18.     Defendant Christine E. Wormuth is sued only in her official capacity as Secretary of the Army. Instructions issued by the Department of Defense provide that Defendant Wormuth has final authority over the assignment of Army personnel to noncombatant status as conscientious objectors. *See* Department of Defense Instruction ("DoDI") 1300.06 ¶ 2.2(b) (2017).

19.     Defendant Major General Brett G. Sylvia is sued only in his official capacity as Commanding General of the 101st Airborne Division. Defendant Sylvia serves as a General Court-Martial Convening Authority ("GCMCA") and is charged with implementing conscientious objection policies and procedures within his command. *See* A.R. 600-43 ¶ 1-4(g), *see also id.* ¶ 2-5(a)(1)(a)–(b*).

## FACTS

### The Conscientious Objector Process

20.    Under federal law, any person inducted into the military by the Selective Service System may seek an "exemption from combatant training and service" in the armed forces because she "is conscientiously opposed to participation in war." *See* 50 U.S.C. § 3806(j).

21.    Through its regulations, the Army has "extend[ed] to persons already within the armed services the rights of conscientious objection." *Aguayo v. Harvey*, 476 F.3d 971, 978 (D.C. Cir. 2007) (quoting *United States ex rel. Sheldon v. O'Malley*, 420 F.2d 1344, 1348 (D.C. Cir. 1969)).

22.    The Army recognizes two forms of conscientious objector status. An individual who "sincerely opposes participation only in combatant military training and service" is eligible for Class 1-A-O status. A.R. 600-43 Glossary of Terms. Such individuals are available for "noncombatant duties," meaning roles that are either "unarmed at all times" or roles with a "primary function" that "does not require the use of arms in combat," provided that such a role is "acceptable to the individual concerned and does not require him or her to bear arms or to be trained in their use." *Id.* Commissioned officers granted Class 1-A-O status generally serve in a "noncombat arms branch" and are "managed and assigned on a case-by-case basis." Army Pamphlet 600-46 ¶ 3-1(b).

23.    Alternatively, an individual who "sincerely opposes participation in combatant and noncombatant military training and service in war in any form" is eligible for Class 1-O status. A.R. 600-43 Glossary of Terms. An individual granted Class 1-O status "normally will be discharged." *Id.* ¶ 3-1(a).

24.     "An applicant claiming 1-O status will not be granted 1-A-O status as a compromise. Similarly, discharge will not be recommended for those who apply for classification as a noncombatant 1-A-O." *Id.* ¶ 1-6(c).

25.     Both forms of conscientious objection are applicable to any person whose objections are "due to sincerely held morals, ethical or religious beliefs, or a combination of such beliefs," and "for whom such beliefs play a significant role in his or her other life." *Id.* Glossary of Terms.

26.     Regulations issued by the Department of Defense and the Army set out the process by which claims of conscientious objection are reviewed.

27.     First, a member of the military who seeks recognition as a conscientious objector must submit an application detailing the history and nature of her beliefs, along with letters of reference or "other relevant items" that support the application. DoDI 1300.06 ¶ 4.1.

28.     Next, a chaplain must interview the applicant and provide "a written opinion as to the nature and basis of the applicant's claim, and as to the applicant's sincerity and depth of conviction." *Id.* ¶ 4.2(b). This opinion "become[s] a part of the application," Army Pamphlet 600-46 ¶ 2-4(a)(1), but the chaplain does not make a "recommendation for approval or disapproval of the application," *id.* ¶ 2-4(h). The applicant must then be evaluated by an "appropriately credentialed mental health professional" who must write a report "indicating the presence or absence of any mental condition that would warrant treatment or disposition" of the applicant's claim "through medical channels." DoDI 1300.06 ¶ 4.2(c); *see also* Army Pamphlet 600-46 ¶ 2-4(b). Upon completion, this report also "become[s] part of the application file," DoDI 1300.06 ¶ 4.2(c), but the mental health professional does not make a "recommendation for approval or disapproval of the application," Army Pamphlet 600-46 ¶ 2-4(b).

29.    Once these reports are completed, the application packet is then forwarded to "the commander exercising special court-martial jurisdiction over the applicant," who in turn appoints an officer outside the applicant's chain of command "to investigate the applicant's claim." Army Pamphlet 600-46 ¶ 2-5(a); *see id.* ¶ 2.5(b)(1). The investigating officer gathers additional information as necessary and conducts a hearing at which the applicant may submit further evidence and present witnesses. *Id.* ¶¶ 2.5–2.6. The investigating officer then prepares a written report that includes a "recommendation for disposition of the case." *Id.* ¶ 2.6(k)(7). When the applicant seeks to be placed in Class 1-A-O, "the investigating officer will not recommend discharge" under Class 1-O. *Id.* ¶ 2-6(k)(9). "Reasons," including a "basis in fact," must be included in the recommendation. *Id.* ¶ 2.6(k)(7).

30.    Following the issuance of the investigating officer's report, the applicant may submit a "rebuttal statement" for inclusion in the application packet, and the applicant is directed to deliver that statement to her "immediate unit commander." *Id.* ¶ 2-6(m).

31.    After the applicant provides a rebuttal statement or waives her right to do so, the applicant's immediate unit commander provides a recommendation for approval or disapproval "with supporting reasons." *Id.* ¶ 2-7(a)(1)(a). The application is then forwarded up the ranks, "through command channels," with the applicant's increasingly senior commanding officers making additional recommendations. *Id.* ¶ 2-7(c). These recommendations must be "based on fact and not conjecture." *Id*.

32.    Eventually, the application and recommendations reach the relevant General Court Martial Convening Authority, usually the highest-ranking officer at the military base where the applicant is stationed, for review of compliance with all "regulatory requirements" and for another "recommendation[] as to disposition of the case." *Id*. The GCMCA's

recommendation must also be "based on fact and not conjecture." *Id.* After the GCMCA's review for "administrative correctness," *id.*, the servicing staff judge advocate—a legal advisor to the GCMCA—also opines on whether the application should be approved or denied, *id.* ¶ 2-7(d); *see also* A.R. 600-43 ¶ 1-4(i)(7).

33.     If the GCMCA concludes that a request for conscientious objection under Class 1-A-O should be approved, then the application is approved and the applicant is granted noncombatant status. A.R. 600-43 ¶ 2-5(a).

34.     If the GCMCA concludes that such a request should be denied, the GCMCA provides a recommendation to that effect and the application is forwarded to the Department of the Army Conscientious Objector Review Board ("DACORB"). The applicant may submit a rebuttal statement in response to the GCMCA's negative recommendation. Army Pamphlet 600-46 ¶ 2-9(b)(1). DACORB reviews the entire case record and makes a recommendation of its own as to the disposition of the application. *Id.*; A.R. 600-43 ¶ 1-4(a)(2)(a).

35.     Following DACORB's recommendation, an application for 1-A-O status is ripe for final determination. Department of Defense policy provides that the Secretary of the Army makes "final determinations" concerning applications for conscientious objector status. DoDI 1300.06 ¶ 2.2(b). The Secretary, in turn, has delegated authority to make final determinations on applications to the Deputy Assistant Secretary of the Army (Review Boards), under the oversight of the Assistant Secretary of the Army (Manpower and Reserve Affairs). *See* A.R. 600-43 ¶¶ 1-4(a)(2)(c), 1-4(b), 2-5(a).

36.     Decisions by the Deputy Assistant Secretary of the Army (Review Boards) are "final," and Army regulations contemplate no further administrative review. *See id.* ¶¶ 1-4(a), 2-5(a). If an applicant's request has been denied, the applicant "may submit second and later

formal applications" only if the applicant presents new "grounds" or "evidence." *Id.* ¶ 2-6a. The Deputy Assistant Secretary's decision thus "marks the point when military administrative procedures have been exhausted." *Parisi v. Davidson*, 405 U.S. 34, 38 n.3 (1972).

### Plaintiff's Sincerely Held Religious Beliefs

37.     Captain Joy Bledsoe's religious faith has long played a central role in her life. Captain Bledsoe (née Schaeffer) grew up in an evangelical church in Cleveland, Ohio, where her father was the senior pastor. Her grandfather had been the senior pastor for many years before her father took over. An American flag was often displayed behind the pulpit, and support for the military was a vocal part of the church's worship.

38.     Her mother was a nurse who stayed home with Captain Bledsoe and her four siblings. Captain Bledsoe's mother spent substantial time volunteering and teaching at the church.

39.     As a child, Captain Bledsoe was heavily involved in the church. Her primary friend group was composed of her peers in the church. She helped with childcare and the church band.

40.     Captain Bledsoe was homeschooled for two years with a Christian curriculum. She also attended a Christian school for a year and a half. Otherwise, she attended public schools.

41.     Throughout her childhood and early adulthood, Captain Bledsoe saw no conflict between her Christian faith and serving as a military combatant. Although she understood the teachings of Christianity to forbid vigilantism or gratuitous violence, she believed Christianity to be fully consistent with service in the armed forces, including the killing of one's enemies in war.

42.    Hoping to serve her country, she applied and was admitted to the United States Military Academy at West Point. Christians in Captain Bledsoe's life during her youth were excited about her desire to join the military and never challenged that desire from a religious perspective.

43.    Captain Bledsoe entered the Academy as a Cadet in 2014 and excelled in her studies and training. She was educated in the tenets of "just war theory," including the fifth century C.E. writings of St. Augustine, which reinforced her view that military combat was not inconsistent with her Christian faith. While at West Point, Captain Bledsoe was an active member of the Officers' Christian Fellowship. She participated in Bible studies with fellow Cadets and was mentored by senior officers who saw no incongruence between their religious beliefs and the taking of human life. Captain Bledsoe graduated from West Point in 2018 and was honored as the valedictorian of her class after receiving the highest performance score among all Cadets based on her academic, physical, and military skills.

44.    In 2018, Captain Bledsoe began postgraduate studies at King's College London on a Marshall Scholarship. In 2019, while in London, Captain Bledsoe's understanding of her own religious beliefs—and their relationship to killing and military combat—began to evolve.

45.    She read widely during her postgraduate studies, including works detailing various Christian theologies of war. Although she maintained her belief in just war theory, she increasingly struggled with how to reconcile military combat with her belief in the sanctity of all life.

46.    After returning to the United States in 2020, Captain Bledsoe completed her training as a Military Intelligence Officer, the role she had been assigned before graduating from West Point.

47.     Captain Bledsoe continued to wrestle with the dictates of her conscience in relation to her assignment as an intelligence officer. She understood that intelligence officers were responsible for helping plan combat missions and building "targeting packets." Targeting packets are compilations of military intelligence used by Army leaders to determine where, when, and how missiles or other weapons will be used to attack enemy combatants. The prospect of contributing to the killing of enemy combatants in this way led her to recognize that military intelligence work might conflict with her Christian faith.

48.     As an intelligence officer, Captain Bledsoe was also required to handle and train with weapons of war. One day at Captain Bledsoe's first duty station, her unit trained by shooting at targets with pictures of real faces taped to them. Captain Bledsoe earned the highest score in the exercise. Her Battalion Commander said, in reference to Captain Bledsoe, "she may look like a hippie, but she'll shoot you in the face." Despite her success in the exercise, that comment made her feel horrible, leading her to further reflect on whether her conscience would permit her to participate in taking human life.

49.     Captain Bledsoe continued to read works on the relationship between Christian faith and violence, to converse with fellow Christians about this issue, and to pray over it. The most pivotal sources for Captain Bledsoe were Jesus's teachings in the Gospels, and in particular, his Sermon on the Mount. *See* Matthew 5–7 (New International Version). After reading *Fight: A Christian Case for Non-Violence* by Preston Sprinkle, Captain Bledsoe became firmly convinced that the meaning of the Sermon on the Mount requires Christian to commit to a life of nonviolence.

50.     Around this time, Captain Bledsoe also read *Unsettling Truths: The Ongoing, Dehumanizing Legacy of the Doctrine of Discovery* by Mark Charles and Soong-Chan Rah.

*Unsettling Truths* includes an argument that Augustinian just war theory was a departure from the teachings of Christ and that it was a moral failure for the early Christian church to adopt that theory. She also read *War: Four Christian Views*, edited by Robert G. Clouse. That book collects essays from four Christian authors, each arguing a distinct view on Biblical teachings about war and a Christian's role in it: (1) active pacifism, (2) passive non-violence, (3) classic just war theory, and (4) pro-preventative wars. After intensive study of and reflection on those texts and others, Captain Bledsoe concluded that her religious beliefs prohibited her from directly taking a human life, and she remained conflicted about whether these beliefs could accommodate her role as an intelligence officer.

51.     In 2023, increased conflict in Europe and the Middle East made the possibility of deployment more imminent, and Captain Bledsoe further considered the role of an intelligence officer in a deployed environment. By the end of October 2023, her beliefs had crystallized.

52.     Since that time, Captain Bledsoe has interpreted the teachings of Jesus to require his followers to live a life of non-violence and to love their enemies. Her beliefs derive from the concept of *imago dei*—the image of God. Captain Bledsoe believes all people bear the image of God, as shown in Genesis 1:27. She believes that connection between God and human beings has profound implications: when a person kills another, no matter the reason, something sacred is destroyed. Captain Bledsoe feels religiously compelled to honor the *imago dei* in all people.

53.     Captain Bledsoe concluded that her religious faith prohibits her from bearing arms against humans, processing intelligence that will be used to kill humans, or training soldiers to do the same. As a result, she realized that her conscience would not permit her to serve in a combatant role in the Army, which includes her current role as a Military Intelligence Officer.

54.    Captain Bledsoe did not, however, come to view her faith as precluding military service entirely. She understands that serving as an intelligence officer or in other combatant roles could force her to engage in activities contrary to her faith, such as handling or training with weapons of war or helping to plan combat missions. At the same time, she also knows that there are many roles within the Army that would align with her beliefs. Captain Bledsoe knows of multiple noncombatant roles in which she could effectively serve that would not conflict with her beliefs, including medical officer, victim advocate, equal opportunity advisor, or inspector general officer.

### Plaintiff's Conscientious Objection Application

55.    In November 2023, Captain Bledsoe submitted an application for conscientious objector status under Class 1-A-O, requesting assignment to noncombatant duties. She submitted several letters of reference from family members, friends, and Army colleagues in support of her application. *See* Ex. A at 60–80.[1]

56.    She was promptly interviewed by a military chaplain, who reported that Captain Bledsoe's religious beliefs were sincere. In accordance with Army regulations, the chaplain's report was included in Captain Bledsoe's application. *See id* at 56–57.

57.    She was also interviewed by an Army mental health professional, who reported that Captain Bledsoe showed no indications of any mental condition that would warrant treatment or disposition of her claim through medical channels. In accordance with Army regulations, that report was also included in Captain Bledsoe's application. *See id.* at 58–59.

---

[1] Plaintiff has redacted the exhibits to this complaint to protect personally identifiable information, including Social Security numbers, Department of Defense identification numbers, dates of birth, email addresses, phone numbers, and home addresses.

58.     Her application was assigned to an investigating officer, who conducted further inquiry into Captain Bledsoe's request and held a hearing at which she testified. The investigating officer concurred with the chaplain's assessment that Captain Bledsoe's religious beliefs were sincere. *See id.* at 46–53. The investigating officer also interviewed Captain Bledsoe's direct supervisor at the time, Major Bryan Smith, who indicated that he supported Captain Bledsoe's application based on his first-hand knowledge of her beliefs. *See id.* at 54. The investigating officer concluded that Captain Bledsoe had a firm, fixed, and sincere objection to serving in a combatant role. The investigating officer recommended that the application for Class 1-A-O status be approved. *See id.* at 52.

59.     Captain Bledsoe's immediate unit commander, Captain Brittany Stanczuk, likewise recommended that Captain Bledsoe's application be approved, noting that she "demonstrated sincere and fixed beliefs." *Id.* at 12–13.

60.     Two additional officers in Captain Bledsoe's chain of command likewise recommended approval of her application. Lieutenant Colonel Matthew Derfler recommended approval because he found that Captain Bledsoe made her request "based on her principles and after much thought and reflection." *Id.* at 13. And Colonel Matthew Kuhns "strongly" recommended Captain Bledsoe be granted Class 1-A-O status because she "has a sincere objection to the bearing of arms because of her religious belief, but has indicated a willingness to continue serving." *Id.*

61.     In accordance with Army regulations, Captain Bledsoe's application was then forwarded to Defendant Sylvia, Captain Bledsoe's GCMCA. Defendant Sylvia and his staff judge advocate both recommended that Captain Bledsoe's application be denied. *See id.* at 15–22.

62.    In his statement of reasons, Defendant Sylvia did not challenge the sincerity of Captain Bledsoe's beliefs. Instead, he incorrectly concluded that her beliefs were inconsistent with any form of continued military service. In reaching that conclusion, Defendant Sylvia misconstrued both the regulatory definition of noncombatant service and the nature of Captain Bledsoe's religious beliefs. First, Defendant Sylvia incorrectly suggested that Class 1-A-O status is appropriate only for those who object to "personally tak[ing] the life of another" but otherwise do not object to military service. *Id.* at 15. Then, despite Captain Bledsoe's repeated statements that her conscience permitted her to serve in multiple noncombatant roles—even though serving in those roles could indirectly contribute to violence—Defendant Sylvia stated that Captain Bledsoe's religious objection "expands to encompass any indirect action that may lead to the death of another." *Id.* Because, in Defendant Sylvia's view, every "position, duty," or [military occupational specialty]" in the Army either directly or indirectly "support[s] and facilitat[es]" violence, he concluded that even noncombatant service would be "incongruent" with Captain Bledsoe's faith and that she was therefore ineligible for Class 1-A-O status. *Id.*

63.    In the course of reaching this conclusion, Defendant Sylvia also noted Captain Bledsoe's "strong viewpoints on U.S. policy and politics" and suggested that these positions may have "impacted her motivation to seek conscientious objector status." *Id.* at 16.

64.    Captain Bledsoe submitted a rebuttal statement in response to Defendant Sylvia's recommendation, reiterating that her conscientious objection to military combat does not extend to noncombatant service. She explained why her beliefs permitted her to serve in noncombatant roles consistent with her religious beliefs, gave specific examples of such roles, emphasized her continued commitment to serving her country, and stressed that Defendant Sylvia's conclusion

that she was conscientiously opposed to military service of any kind reflected an inaccurate understanding of her beliefs. *See id.* at 24–38.

65.     Had Defendant Sylvia determined that Captain Bledsoe's application should be approved, she would have been granted Class 1-A-O status immediately. But because Defendant Sylvia recommended that her application be denied, Captain Bledsoe's application was forwarded to DACORB for further consideration and an additional recommendation. DACORB took into account the application materials as well as the reports and recommendations of the chaplain, the investigating officer, the immediate unit commander and additional commanding officers, Defendant Sylvia, and the GCMCA's staff judge advocate.

66.     In the "Discussions" section of its decision, DACORB stated that Defendant Sylvia's "recommendation for disapproval was legally and procedurally erroneous with respect to the governing regulation and has no basis in fact." *Id.* at 10–11. After conducting a "thorough and comprehensive review" of Captain Bledsoe's case, DACORB concluded that she had established, by clear and convincing evidence, that she satisfied the "criteria prescribed in the governing regulation for conscientious objection." *Id.* at 11. DACORB therefore recommended that Captain Bledsoe "warrant[ed] classification status as a Conscientious Objector" under Class 1-A-O. *Id.*

67.     Following DACORB's recommendation, Captain Bledsoe's application was ripe for final determination. Defendant Wormuth and Defendant Schaefer have delegated the authority to make final determinations on conscientious objection applications to Defendant Mahoney.

68.     On July 24, 2024, Defendant Mahoney rejected DACORB's recommendation and issued a brief, unreasoned denial of Captain Bledsoe's application. *See id.* at 1.

69.    Defendant Mahoney devoted only a single sentence to explaining his denial: "Contrary to the DACORB recommendation, I do not find sufficient evidence to grant the request." *Id.*

70.    Captain Bledsoe did not understand why her request was denied. She sought clarity on the reasons and attempted to determine through appropriate channels what aspect of her application she could supplement with additional evidence.

71.    Captain Bledsoe first filed an inquiry with her Member of Congress, Rep. Max Miller, who in turn requested information from DACORB. Colonel Jerry E. Chandler, the President of DACORB, responded to the request. Colonel Chandler's response shed little light on the denial of Plaintiff's application. Colonel Chandler stated that "the basis" for Defendant Mahoney's conclusion was that he "did not find sufficient evidence to grant the request." Ex. B at 2. And Colonel Chandler indicated that Defendant Mahoney "concurred with" Defendant Sylvia's recommendation. *Id.* Colonel Chandler provided no additional insight into Defendant Mahoney's reasoning or what additional evidence could resolve the deficiency.

72.    Colonel Chandler's letter further confused Captain Bledsoe because it misrepresented her application. The letter stated that Captain Bledsoe's "application requested that she be categorized as a noncombatant yet remain in the Army as a Military Intelligence Officer," noting that "[t]hese are incompatible outcomes." *Id.* But Captain Bledsoe did not request to remain in the Army as an intelligence officer. To the contrary, throughout the application process she stressed her desire to be moved from Military Intelligence to a noncombatant role consistent with her religious beliefs. Indeed, Captain Bledsoe's rebuttal to Defendant Sylvia's recommendation listed several such roles that were consistent with her beliefs and her training, all of which were outside the Army's Military Intelligence branch.

18

73.     Captain Bledsoe sought further information about the denial of her application by filing a complaint with the United States Army Inspector General Agency. The Inspector General Agency examined whether Defendant Mahoney wrongfully overturned DACORB's decision and whether Defendant Sylvia improperly recommended that Captain Bledsoe's application be denied. At the conclusion of its process the Inspector General Agency issued a brief letter that was even less illuminating than Colonel Chandler's. The letter stated simply that the Inspector General Agency found "no indication of any misconduct" in the processing of Captain Bledsoe's application. Ex. C at 1.

74.     Captain Bledsoe exhausted all remedies available to her within the Army by diligently pursuing her application through final decision. In addition, she sought a congressional inquiry and filed a complaint with the Inspector General Agency.

75.     As a result of Defendants' denial of her application, Captain Bledsoe remains a Military Intelligence Officer. That role involves training with and studying arms. In addition, she can be deployed at any moment. If she is, she will be forced to bear arms against humans, process intelligence that will be used to kill humans, or train soldiers to do the same—actions that conflict with her sincerely held religious beliefs.

## CAUSES OF ACTION

### <u>Count I</u>

**Religious Freedom Restoration Act (42 U.S.C. § 2000bb *et seq.*)**

76.     Plaintiff repeats and incorporates by reference each of the allegations set forth in each of the preceding paragraphs of this Complaint.

77.     RFRA provides that the federal "[g]overnment shall not substantially burden a person's exercise of religion" unless such burden "is in furtherance of a compelling

governmental interest" and "is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1.

78.    Under RFRA, exercise of religion includes "'not only belief and profession but the performance of (or abstention from) physical acts' that are 'engaged in for religious reasons.'" *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 710 (2014) (quoting *Emp. Div. v. Smith*, 494 U.S. 872, 877 (1990)).

79.    RFRA applies with full force to "the free exercise claims of military personnel." S. Rep. No. 103-111, at 12 (1993); *see, e.g.*, *Singh v. Berger*, 56 F.4th 88, 97 (D.C. Cir. 2022); *Singh v. McHugh*, 185 F. Supp. 3d 201, 218 (D.D.C. 2016); DoDI 1300.17 ¶ 1.2(e) (2020).

80.    Serving in a combatant role "substantially burden[s]" Captain Bledsoe's "exercise of religion." 42 U.S.C. § 2000bb-1. Captain Bledsoe's sincere religious beliefs preclude her from serving in a role in the Army that would require her to bear arms against humans, process intelligence that will be used to kill humans, or train soldiers to do the same. Defendants' failure to grant her application for conscientious objector status substantially burdens her exercise of religion by forcing her to remain in a role that may require her to violate her conscience.

81.    Defendants cannot meet their burden of showing that the denial of Captain Bledsoe's application for Class 1-A-O status was "in furtherance of a compelling governmental interest" or "the least restrictive means of furthering" any such interest. 42 U.S.C. § 2000bb-1. Defendants have no compelling interest in forcing Captain Bledsoe to remain in a role that violates her sincerely held religious beliefs. And even if the government could assert a compelling interest, refusing to accommodate Captain Bledsoe's religious exercise is not the least restrictive means of achieving any such interest. The very existence of Class 1-A-O status demonstrates that the Army's interests are fully compatible with accommodating noncombatant

conscientious objectors. And Captain Bledsoe has identified roles within the Army in which she is willing and able to serve. If allowed to stand, Defendants' misinterpretation of Class 1-A-O status would have an adverse impact on military readiness, unit cohesion, good order and discipline, and health and safety, by denying the Army the service of highly qualified, capable soldiers like Captain Bledsoe who are willing and able to serve in noncombatant roles.

82.     Defendant Mahoney's unreasoned denial provides no compelling justification for burdening Captain Bledsoe's religious beliefs.

## Count II

### Administrative Procedure Act (5 U.S.C. § 701 *et seq.*) – Violation of Regulations

83.     Plaintiff repeats and incorporates by reference each of the allegations set forth in each of the preceding paragraphs of this Complaint.

84.     Defendant Mahoney's denial of Captain Bledsoe's application constitutes "final agency action" and is thus "subject to judicial review." 5 U.S.C. § 704.

85.     Under the APA, a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also id.* § 706(2)(C) (same for actions "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right").

86.     It is a "well-settled rule that an agency's failure to follow its own regulations is fatal to the deviant action." *Union of Concerned Scientists v. Atomic Energy Comm'n*, 499 F.2d 1069, 1082 (D.C. Cir. 1974).

87.     Army regulations provide that Class 1-A-O status is appropriate for any servicemember "who, by reason of conscientious objection, sincerely opposes participation only in combatant military training and service and for whom such beliefs play a significant role in his

21

or her other life." A.R. 600-43 Glossary of Terms; *see also* DoDI 1300.06 ¶ G.2 (same).
Defendant Sylvia, in refusing to approve Captain Bledsoe's application, applied a different
standard by deeming Class 1-A-O status appropriate only for "an individual who cannot
personally take the life of another." Ex. A at 15.

88.    Defendant Sylvia further neglected federal regulations when he superimposed his
own understanding of Captain Bledsoe's beliefs onto her application. An applicant for Class
1-A-O status bears "the burden of determining and setting forth the exact nature of the request;
that is, whether they request separation based on conscientious objection (1-O) or reassignment
to noncombatant training and service based on conscientious objection (1-A-O)." A.R. 600-43
¶ 1-6(b). In her original application, Captain Bledsoe completed a counseling statement pursuant
to Army Pamphlet 600-46 ¶ 2-3(a)(1), in which she averred that she was "request[ing]
assignment to noncombatant duties for the remainder of [her] term of service." Ex. A at 81.

89.    Although Class 1-A-O status may be denied on the grounds that the applicant's
conscientious objection is insincere, it is not the Army's role to determine the scope of an
applicant's sincere objection. "The task" for the Army is not to reconstruct the applicant's belief
system but rather "to decide whether the beliefs professed are sincerely held, and whether they
govern the claimant's actions in both word and deed." DoDI 1300.06 ¶ 3.2(d); *see also id.*
¶ 3.2(c)(2) ("Particular care must be exercised not to deny the existence of authentic beliefs
simply because those beliefs are incompatible with the reviewing authority's belief system.").
Without disputing the sincerity of Captain Bledsoe's beliefs, Defendant Sylvia ignored her
repeated statements that service in a noncombatant role would accord with her conscience. In
doing so, Defendant Sylvia mistakenly relied on his own opinion about Captain Bledsoe's beliefs
to determine that even noncombatant status would be "incongruent" with them. Ex. A. at 15.

90.     Defendant Sylvia also referenced irrelevant factors in denying Captain Bledsoe's application. "Applicants who are otherwise eligible for conscientious objector status may not be denied that status simply because of their views on the nation's domestic or foreign policies." A.R. 600-43 ¶ 1-6(a)(4); *see also Watson v. Geren*, 569 F.3d 115, 132 (2d Cir. 2009). In refusing to approve Captain Bledsoe's application, Defendant Sylvia cited her "strong viewpoints on U.S. policy and politics," suggesting that they may have "impacted her motivation to seek conscientious objector status." Ex. A at 16. But Defendant Sylvia did not—and could not— determine that Captain Bledsoe applied for conscientious objector status solely because of her views on specific U.S. policies. To the contrary, Defendant Sylvia acknowledged that Captain Bledsoe's "motivation for seeking noncombatant status" was tied to her "religious training and/or belief," the sincerity of which he never questioned. *Id.* (internal quotation marks omitted). Defendant Sylvia's reference to Captain Bledsoe's policy views thus imported improper considerations into his review of her application.

91.     Defendant Sylvia's analysis of Plaintiff's application was contrary to the governing regulations.

92.     To the extent that Defendant Mahoney relied on Defendant Sylvia's opinion when denying Plaintiff's application, Defendant Mahoney's decision was also contrary to the governing regulations. In response to Captain Bledsoe's congressional inquiry, Colonel Chandler, the President of DACORB, stated: "Ultimately, the DASA(RB) [Defendant Mahoney] concurred with the General Court-Martial Convening Authority's [Defendant Sylvia's] recommendation." Ex. B at 2.

93.     Defendant Mahoney's decision violated the regulations because he denied Captain Bledsoe's application even though it met the relevant regulatory standard.

## Count III

**Administrative Procedure Act (5 U.S.C. § 701 *et seq.*) – Arbitrary and Capricious**

94.    Plaintiff repeats and incorporates by reference each of the allegations set forth in each of the preceding paragraphs of this Complaint.

95.    Defendant Mahoney's denial of Captain Bledsoe's application constitutes "final agency action" and is thus "subject to judicial review." 5 U.S.C. § 704.

96.    Under the APA, a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

97.    "The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). For an action to pass muster under this standard, the agency must have "reasonably considered the relevant issues and reasonably explained the decision." *Id.*

98.    Defendants failed to provide adequate reasons for denying Captain Bledsoe's application. Defendant Mahoney, who made the final determination regarding Captain Bledsoe's request, issued his disapproval without providing any reasoning to support the decision. In a single sentence, he merely stated the bare conclusion that Captain Bledsoe failed to provide "sufficient evidence" to support her application. Ex. A at 1. In so doing, Defendant Mahoney did not state what portion of the application lacked sufficient evidence or address any of the extensive evidence it contained. Nor did he provide any rationale to support his decision. Defendant Mahoney's failure to even acknowledge Plaintiff's evidence—let alone provide reasons why her evidence was insufficient—was arbitrary and capricious.

## PRAYER FOR RELIEF

WHEREFORE, Captain Bledsoe respectfully requests that this Court:

(a)    Declare unlawful and set aside Defendants' denial of Captain Bledsoe's application for Class 1-A-O conscientious objector status;

(b)    Order Defendants to grant Captain Bledsoe's application for Class 1-A-O conscientious objector status and permanently enjoin Defendants from assigning her to duties incompatible with that status;

(c)    Award Captain Bledsoe reasonable fees, costs, and expenses, including attorneys' fees, pursuant to any applicable law; and

(d)    Award such other and further relief as the Court deems equitable, just, and proper.

Respectfully submitted this December 17, 2024,

/s/ Seth Wayne
Seth Wayne
    DC Bar No. 888273455
William Powell
    DC Bar No. 1672707
INSTITUTE FOR CONSTITUTIONAL
ADVOCACY & PROTECTION
Georgetown Law
600 New Jersey Ave. NW
Washington, D.C. 20001
Phone: (415) 516-4939
sw1098@georgetown.edu
william.powell@georgetown.edu

*Attorneys for Plaintiff*